UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN TRANSIT INSURANCE COMPANY,<br><br>Plaintiff,<br><br>-against-<br><br>RIGHT CHOICE PHARMACY INC, FLORINA FARBER, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5,<br><br>Defendants. | CIVIL ACTION<br><br>25-CV-3925<br><br>COMPLAINT<br><br>(JURY TRIAL DEMANDED) |

American Transit Insurance Company (interchangeably referred to herein as "Plaintiff" and "American Transit"), by its attorneys Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Defendants Right Choice Pharmacy Inc ("Right Choice"), Florina Farber ("Farber") (Right Choice and Farber are collectively referred to as "Pharmacy Defendants"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively, "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least 2012 and continuing through the filing of this Complaint, Defendants engaged in a massive scheme to defraud Plaintiff, through the exploitation of New York's Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").

2.      Pursuant to the No-fault Law, policyholders and others who suffer injuries in automobile accidents ("Covered Persons") can obtain payments from the policyholders' automobile insurance companies, including Plaintiff, for necessary medical care ordered by the Covered Persons' physicians or prescribing providers. Covered Persons are also permitted to assign those benefits to doctors and other licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

3.      This action seeks to recover more than $46,000.00 that Defendants stole from Plaintiff, and other economic injuries suffered by Plaintiff which flowed directly from the submission of hundreds of false and/or fraudulent insurance claims, seeking reimbursement for specifically targeted, medically unnecessary "pain relieving" pharmaceutical products, including topical pain creams, topical pain patches, and a limited variety of other oral medications.

4.      As part of the scheme to defraud alleged herein, the Pharmacy Defendants entered into illegal kickback arrangements with No-fault clinics in the New York metropolitan area (the "No-fault Clinics") and unlicensed laypersons who work at or are associated with the No-fault Clinics ("Clinic Controllers").

5.       Pursuant to these arrangements, and in exchange for kickbacks and/or other financial consideration, the Clinic Controllers, which are not named as defendants in this action, facilitated the scheme by ensuring that their associated doctors, orthopedic surgeons, and/or nurse practitioners (hereinafter "Healthcare Practitioners" or "HCPs") prescribed expensive, pre-formulated topical pain creams, gels, lotions, ointments, and patches dispensed and billed in exorbitant prices by Right Choice, including, lidocaine 5% ointment, diclofenac sodium 3% gel, and lidocaine 4.5%-menthol 5% transdermal patches (at times prescribed and/or billed under the brand name Lidothol) ("Lidothol patches" or "lidocaine 4.5%-5% transdermal patches"), (collectively, the "Topical Pain Pharmaceuticals"), as well as a select few oral medications, primarily in the form of a limited variety of nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as Ibuprofen, Naproxen, and Celecoxib, and a limited variety of muscle relaxers, such as Cyclobenzaprine, and Tizanidine.   These medications were routinely prescribed to Covered Persons, rather than commercially available and more affordable over-the-counter medications and pain creams, gels, lotions, ointments, and/or patches that have been approved by the FDA. Right

Choice targeted the Topical Pain Pharmaceuticals and other select oral medications rather than the cheaper over-the-counter alternatives for no other purpose than to submit fraudulent, inflated bills to Plaintiff for reimbursement, exploiting the Covered Persons for financial gain, without regard to genuine patient care.

6.      In furtherance of Defendants' scheme to defraud, Covered Persons who were purportedly involved in automobile accidents would present to the No-fault Clinics where they would, as a matter of pattern, practice, and protocol, be prescribed certain medications specifically targeted for their high profit margins, including Topical Pain Pharmaceuticals and/or a limited variety of other medications such as NSAIDs or muscle relaxers, irrespective of medical necessity.

7.      Months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

8.      Covered Persons would then be prescribed an additional round of the same Topical Pain Pharmaceuticals, oral NSAIDs and/or muscle relaxers, irrespective of medical necessity.

9.      The prescriptions for the Topical Pain Pharmaceuticals, which were issued by the HCPs at the direction of and/or pursuant to the treatment protocol orchestrated by the No-fault Clinics and sent to Right Choice for dispensing and billing, were often tailored to a boilerplate, pre-printed examination reports designed to limit the prescribing providers' prescriptions to a pre-determined treatment protocol, and justify continued, voluminous, and excessive use of prescribed pharmaceuticals, including the Topical Pain Pharmaceuticals and other select oral medications.

10.    To effectuate the scheme and maximize profits, Pharmacy Defendants dispensed a handful of specific pain medications, including the Topical Pain Pharmaceuticals and a select few oral NSAIDs and muscle relaxers, based solely on the medications' exorbitant pricing and high profit margins.  In exchange for kickbacks and financial incentives and pursuant to collusive, illegal arrangements, Defendants, through the Clinic Controllers, induced the HCPs to prescribe these targeted, exorbitantly priced medications, including the Topical Pain Pharmaceuticals and other select NSAIDs and muscles relaxers, without regard to genuine patient care, and directed large volumes of these prescriptions to Right Choice.

11.    In keeping with the fact that the prescriptions and medications are fraudulently prescribed by the No-fault Clinics and/or Clinic Controllers, at least one physician who purportedly provided services to Covered Persons at a No-fault Clinic has admitted that the prescriptions for Topical Pain Pharmaceuticals and other select NSAIDs and muscles relaxers that were issued to and filled by Right Choice were fraudulent, unauthorized, contained the physician's forged signature, would never be issued by the physician for the medications prescribed and the purported statement of medical necessity was a fabrication.

12.    Once the Topical Pain Pharmaceuticals and/or other oral medications were prescribed, if they were dispensed at all, the pharmaceuticals were either given to Covered Persons directly at the No-fault Clinics or mailed to the Covered Persons from Right Choice.  Covered Persons were not given any choice as to where their prescriptions would be filled.

13.    When the Pharmacy Defendants purported to provide the Topical Pain Pharmaceuticals and/or other medications to Covered Persons covered by Plaintiff, Right Choice sought reimbursement directly from Plaintiff pursuant to executed "Assignment of Benefit" ("AOB") forms, executed "Delivery Slip" and/or "Delivery Sheet" ("Delivery Receipt") forms,

and New York State Department of Insurance claim form ("NF-3"), often with additional forms including "Invoices" from Right Choice listing each billed-for pharmaceutical by its national drug code ("NDC")[1] number, with the corresponding quantity, price and cost basis of "U&C," or usual and customary pricing noted.

14.     The Pharmacy Defendants also never submitted wholesale purchase invoices to Plaintiff demonstrating the NDC number for the pharmaceuticals Right Choice obtained and how much Right Choice actually paid the suppliers for these pharmaceuticals, or whether Right Choice actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

15.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiff by Farber, through Right Choice, sought reimbursement for the Topical Pain Pharmaceuticals or other select NSAIDs and muscles relaxers that Pharmacy Defendants could readily buy at a low cost and bill to Plaintiff at inflated amounts based on egregiously high wholesale prices. Defendants, in concert with the Clinic Controllers, steered the HCPs to prescribe these pharmaceuticals specifically because of their high profit margins, irrespective of medical necessity, pharmacological outcome, or genuine patient care, and despite the availability of cheaper over-the-counter and FDA-approved medications.

16.     On information and belief, by entering into kickback arrangements with the No-fault Clinics and/or Clinic Controllers for a steady supply of prescriptions for Topical Pain Pharmaceuticals and/or a select number of oral medications, and by dispensing these Topical Pain Pharmaceuticals and other pain medications irrespective of medical necessity pursuant to bogus prescriptions, Defendants engaged in conduct which demonstrated a blatant disregard for the laws

---

[1] A National Drug Code ("NDC") number is a unique 10- or 11-digit code that identifies each prescription drug product (whether brand name or generic) by the drug itself, the vendor of the drug and the quantity in which the drug was packaged.

of New York State which govern the proper operation of a pharmacy and the proper dispensing of drug products, as well as laws which prohibit illegal fee splitting and the solicitation of patients.

17.     By way of example and not limitation, New York Education Law § 6509-a, prohibits a professional licensee, such as a pharmacy, from directly or indirectly requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications, and 8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee, such as a pharmacy, from directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

18.     In addition, the Official Compilation of Codes, Rules and Regulations of the State of New York governing Official Prescriptions, Section 910.2(f), states that an order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations.

19.     The scheme to defraud orchestrated by the Defendants by which Farber, through Right Choice, routinely dispensed the Topical Pain Pharmaceuticals and/or a limited variety of other medications, including NSAIDs and muscle relaxers, without regard to medical necessity, not only demonstrated a deliberate disregard for the laws of New York State in furtherance of theft from Plaintiff, but also posed a significant risk to the health of such patients.

20.     Farber, through Right Choice, fraudulently submitted, or caused to be submitted, bills to Plaintiff for Topical Pain Pharmaceuticals and a select variety of oral medications,

including NSAIDs and muscle relaxers, that were provided to Covered Persons (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.  By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet listing representative samples of claims Plaintiff paid to Right Choice for Topical Pain Pharmaceuticals and the select variety of oral medications that were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

21.    In each instance, the Pharmacy Defendants knew or should have known that the claims they submitted to Plaintiff were bogus and contained material and misleading statements regarding the propriety of the billed-for services.

22.    In particular, the Pharmacy Defendants knew or should have known that the claims that they submitted to Plaintiff were for Topical Pain Pharmaceuticals Products and a select variety of oral pain medications which were provided: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

23.     On information and belief, the Defendants willfully engaged in the practices alleged herein with the sole object of converting money.

24.     In addition to payments resulting from fraudulent claims, the fraudulent activities engaged in by Defendants caused Plaintiff to suffer further economic injury, including, but not limited to, expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and/or peer reviews.

25.     It was a foreseeable consequence of Defendants' scheme to defraud that Plaintiff would incur expenditures in an effort to verify Defendants' fraudulent claims.

26.     At all times relevant herein, but for Defendants' fraudulent misrepresentations, Plaintiff would not have incurred expenditures in an effort to verify the Pharmacy Defendants' fraudulent claims.

27.     At all times relevant herein, Defendants fraudulent misrepresentations directly and proximately resulted in Plaintiff incurring expenditures in an effort to verify the Pharmacy Defendants' fraudulent claims.

28.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies. The Defendants adopted a fraudulent blueprint regarding the dispensing of pharmaceuticals, including but not limited to Topical Pain Pharmaceuticals and a select variety of oral medications, including NSAIDs and muscle relaxers, as their business plan, and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from the creation of fraudulent NF-3s, to the formation of kickback arrangements with

the  No-fault Clinics, to the illegal bulk dispensing of the Topical Pain Pharmaceuticals, to record keeping to billing, was carried out for the purpose of committing fraud.

29.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for pharmaceutical products.  In doing so, Plaintiff seek compensatory damages and declaratory relief that Plaintiff is not required to pay any of Right Choice's claims for Topical Pain Pharmaceuticals or the other select variety of oral medications, including NSAIDs and muscle relaxers, submitted to Plaintiff for reimbursement because they were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions. By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of the in excess of $1,200,000.00 in unpaid No-fault claims from Right Choice  which form the basis of Plaintiff' request for declaratory relief.  Said spreadsheet is grouped by claim number, date of service and the amount pending.

## STATUTORY/REGULATORY SCHEME

30.     Pursuant to the No-fault Law, Plaintiff are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other

properly licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

31.     As alleged herein, the Pharmacy Defendants exploited and continue to exploit the No-fault Law by obtaining such assignments, and dispensing and billing for Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, that if provided at all, were medically unnecessary and provided pursuant to a fraudulent protocol in which in which virtually all Covered Persons were prescribed the Topical Pain Pharmaceuticals and/or the select variety of oral medications irrespective of need and/or in violation of state and/or federal law.

32.     Right Choice is ostensibly a licensed pharmacy that bills for pharmaceuticals provided to, among others, individuals covered under the No-fault Law. In exchange for their services, Right Choice accepted assignments of benefits signed by Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

33.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Right Choice submitted bills for their claims to Plaintiff using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form, or a substantially similar form.

34.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiff by Right Choice contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

35.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

36.    Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a pharmacy, may recover for health service-related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

37.    Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the New York State Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault law.  11 N.Y.C.R.R. § 68.1.

38.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") which is a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

39.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

40.     The maximum amount that a healthcare provider may charge for a medically necessary prescription drug or product pursuant to the No fault Law is based upon the drug's NDC number.

41.     Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

42.     For each generic drug the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

43.     AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> [t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee.

44.     On information and belief, Right Choice was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

45.     On information and belief, Defendants intentionally targeted the Topical Pain Pharmaceuticals with extremely expensive AWPs in order to inflate the billing submitted through Right Choice and to maximize their profits.

46.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, to the extent that they provided any Topical Pain Pharmaceuticals at all.

## NATURE OF THE ACTION

47.     This action is brought pursuant to:

212)     The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. § 1962(c);

ii)     New York State Common Law; and

iii)     The Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## NATURE OF RELIEF SOUGHT

48.     Plaintiff seeks treble damages that it sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiff for pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals and select oral medications that it allegedly dispensed to individuals covered by Plaintiff under New York State's No-fault Law.

49.     Plaintiff seek compensatory and punitive damages under the Common Law.

50.     Plaintiff further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

51.     Plaintiff further seeks a judgment declaring that it is under no obligation to pay any of Defendants' unpaid No-fault claims for Topical Pain Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, which were dispensed pursuant to the fraudulent scheme set forth herein.

52.     As a result of Defendants' actions alleged herein, Plaintiff was defrauded of an amount in excess of $46,000.00, the exact amount to be determined at trial, in the form of payments to Defendants and/or expenses incurred by Plaintiff as a result of Defendants fraudulently billing

Plaintiff for Topical Pain Pharmaceuticals and select other oral medications, primarily in the form of oral pain relievers and muscle relaxants, that they knew or should have known were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.

## THE PARTIES

### A.     Plaintiff

53.     Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business in Brooklyn, New York.

### B.     The Defendants

54.     Defendant Right Choice Pharmacy Inc ("Right Choice"), a New York corporation formed on or about January 7, 2011, was first registered as a pharmacy with the New York State Office of Professions on February 15, 2022, and purports to operate its principal place of business located at 2115 Kimball Street, Brooklyn, New York. Right Choice is operated, managed, and controlled by Defendant Farber and submitted fraudulent claims to Plaintiff seeking reimbursement for pharmaceutical products under the No-fault.

55.     Florina Farber ("Farber"), a natural person residing in the State of New York, is the principal record owner and operator of Defendant Right Choice, and at all times relevant herein, operated, managed, and/or controlled its activities.

56.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

57.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiff that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

58.     The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

59.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

60.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), and the claim for declaratory relief based upon 28 U.S.C. § 2201 and § 2202.

61.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York C.P.L.R. § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

62.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## **FACTUAL BACKGROUND**

63.     Plaintiff underwrites automobile insurance in New York State and participates as insurers in New York State's No-fault program.

64.     As set forth in the Statutory/Regulatory Scheme section above, under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, *et seq*., Plaintiff is required to pay, *inter alia*, for health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

65.     Right Choice is ostensibly a pharmacy that bills for prescription pharmaceuticals provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Right Choice accepts assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

66.     The Pharmacy Defendants purportedly dispensed pharmaceutical products to Covered Persons for the purported treatment by the No-fault Clinics, and often referred by the No-fault Clinics for medically unnecessary surgical consultations and purportedly underwent medically unnecessary and arthroscopic procedures at ASCs in New York or New Jersey for treatment of soft tissue injuries, such as sprains and musculoskeletal pain, and submitted claims for payment to Plaintiff for such services.

67.     In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 et seq., the Defendants submitted proof of their claims to Plaintiff using a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form or a substantially similar form.

68.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiff by the Defendants contained the following (or substantially similar) warning on the last page of the claim form:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, may be guilty of a criminal act punishable under law and may be subject to civil penalties.

69.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff are required to promptly process claims within 30 days of receipt of the proof of claim.

70.     To fulfill its obligation to promptly process claims, Plaintiff justifiably relied upon the bills and documentation submitted by Farber, through Right Choice, in support of their claims for pharmaceutical products, and paid Right Choice based on the representations and information that Defendants submitted to Plaintiff.

71.     At all relevant times Right Choice is an illegal enterprise that engaged in common, systematic and pervasive fraudulent practices.

72.     Right Choice, which is purportedly owned, operated, and controlled by Farber, was part of a racketeering scheme that distinguished it from a legitimate healthcare provider/pharmacy as follows:

- Unlike legitimate pharmacies, Right Choice routinely misrepresented that it was dispensing Topical Pain Pharmaceuticals and select oral medications pursuant to legitimate New York State Prescriptions, when it was not;

- Unlike legitimate pharmacies, Right Choice routinely filled prescriptions directly from No-fault Clinics which constituted obvious therapeutic duplication notwithstanding the potential danger therapeutic duplication posed to Covered Persons;

- Unlike legitimate pharmacies, Right Choice misrepresented that it was in conformance with material licensing requirements which would entitle it to reimbursement of No-fault benefits when, in fact, it was involved in collusive relationships with providers that issue illegal prescriptions pursuant to an unlawful kickback arrangement and/or other financial incentives;

- Unlike legitimate pharmacies, Right Choice dispensed pharmaceuticals to fill fraudulent and boilerplate prescription forms it received from the No-fault Clinics pursuant to illicit kickback agreements;

- Unlike legitimate pharmacies, Right Choice arranged to have prescriptions submitted to them by the HCPs without allowing the patients the option to determine which pharmacy would fill their prescription; and

- Unlike legitimate pharmacies, Right Choice entered into kickback agreements with No-fault Clinics in order to generate a large volume of prescriptions pursuant to a fraudulent, pre-determined treatment and billing protocol whereby Covered Persons received Topical Pain Pharmaceuticals and/or other oral medications irrespective of medical necessity.

73.    The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Farber engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) issue prescriptions for large amounts of virtually identical Topical Pain Pharmaceuticals and other select oral medications to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions, in order to conform the prescriptions to a pre-determined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Right Choice, numerous fraudulent claim forms seeking payment for Topical Pain Pharmaceuticals

and other select oral medications that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiff; and/or

- Mailed or caused those acting under her direction to mail bogus claims to Plaintiff, knowing that they contained materially false and misleading information.

74.    At all relevant times mentioned herein, Farber knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Topical Pain Pharmaceuticals and other select oral medications.

75.    At all relevant times mentioned herein, Farber, through Right Choice, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

76.    At all relevant times mentioned herein, Farber and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiff, in particular, of money.

77.    In these and numerous other ways, Defendants sought to deceive Plaintiff into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

A.    **The Fraudulent Prescription and Examination Reports**

78.    As a matter of pattern, practice and protocol, the No-fault Clinics routinely prescribed, or purported to prescribe, the Topical Pain Pharmaceuticals and select other medications, including NSAIDs and muscle relaxers, pursuant to a pre-determined protocol irrespective of medical necessity.

79.     On information and belief, in furtherance of this pre-determined protocol and in order to further facilitate the fraud set forth herein, Defendants entered into agreements with one or more of the No-fault Clinics, Clinic Controllers, and HCPs to utilize generic, boilerplate examination reports specifically designed to justify the continued and voluminous use of medically unnecessary Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers.

80.     By way of example and not limitation, in many instances, the generic, boilerplate examination reports were pre-printed and routinely contained one or more of the following pre-determined medications, with preset options for strength and directions on how often to take or apply the medications prescribed, which the prescribing providers could select by circling the name and strength of the medication on the generic, preprinted, boilerplate examination report:

> -lidocaine 5% topical ointment
> -diclofenac 3% Gel
> -cyclobenzaprine 5/7.5 mg/10mg
> -Celebrex 200 mg
> -ibuprofen 400/600/800 mg

81.     Exhibit "3" in the accompanying Compendium of Exhibits is a sampling of the Fraudulent Prescription Forms for Right Choice, along with a sampling of the generic, preprinted, boilerplate examination reports utilized by the No-fault Clinics, Clinic Controllers, and prescribing providers.

82.     The No-fault Clinics, Clinic Controllers, and HCPs would, in many instances, utilize generic, preprinted, boilerplate examination reports with preprinted medications designed to intentionally limit the pharmaceutical options available to Covered Persons to those which could reap Defendants the most profits, notwithstanding any perceived benefit or harm to Covered Persons.

83.     Moreover, the reliance upon generic, preprinted, boilerplate examination reports by No-fault Clinics, Clinic Controllers, and/or prescribing providers renders the prescriptions submitted by Defendants to Plaintiff in violation of Section 910 of the Official Compilation of Codes, Rules and Regulations of the State of New York, which provides that:

> [a] prescription shall be issued by a practitioner for legitimate medical purposes in good faith and in the course of his or her professional practice only. An order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations.

10 N.Y.C.R.R. § 910(2)(f).

84.     On information and belief, at all times relevant herein, the Defendants knew or should have known that the pre-printed, boilerplate examination reports were bogus.

**B.      Overview of Laws and Regulations**

### *Overview of Guidelines for Topical Pain Pharmaceuticals*

85.     On information and belief, topical pain medications, such as diclofenac sodium 3% gel, and lidocaine 5% ointment, and Lidothol patches, are a type of topical pain-relief medications that are "locally administered treatments."

86.     The role of topical pain medications in pain management is not a scientifically proven fact. By way of example and not limitation, according to medical literature, due to the absence of specific compliance and adherence studies comparing topical treatment versus traditional routes in pain management, the role of topical preparations in patient adherence remains obscure.

87.     Topical pain creams should undergo trials, including in the case of topical lidocaine, a trial in the range of 2-4 weeks.

88.    The ingredients used in the Topical Pain Pharmaceuticals include NSAIDs, which is not always appropriate in some clinical settings. For example, it is well known that people who use NSAIDs (other than aspirin) may have a higher risk of having a heart attack or a stroke than people who do not use those medications, and these events may happen without warning and may even cause death.

89.    The medical standard in reference to topical drug delivery, as presented in the Workers Compensation Board New York Non-Acute Pain Medical Treatment Guidelines, First Edition, September 15, 2014, pages: 37-38, and Current Edition, effective May 2, 2022, page 39, states the following: "For most patients, the effects of long-term use are unknown and thus may be better used episodically. These agents may be used in those patients who prefer topical treatments over oral medications."

90.    According to the latest Workers Compensation Board Medical Treatment Guidelines (First Edition, September 15, 2014, pages: 28-38; Current Edition, effective May 2, 2022, page 32) regarding Non-Acute Pain, "Topical, oral, and/or systemic compound medications are not recommended."

### *Overview of New York State Laws and Regulations Regarding Operations of Legitimate Pharmacies*

91.    Pursuant to New York State law, a provider of healthcare services is not entitled to reimbursement for No-fault Benefits if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

92.    New York Education Law § 6808, prohibits a person, firm, corporation, or association from possessing drugs, prescriptions, or poisons for the purpose of compounding,

dispensing, retailing, wholesaling, or manufacturing, or offering drugs, prescriptions, or poisons for sale at retail or wholesale unless they are registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

93.    New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of a secret formula ("coded") or specially marked prescriptions.

94.    New York Education Law § 6810(7)(a) prohibits pharmacies from dispensing a drug when a prescription form for the drug includes any other drug.

95.    New York Education Law § 6810(9) prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

96.    New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of coded prescriptions.

97.    New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

98.    8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

99.     New York Education Law § 6530(18) prohibits a licensed physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in exchange for patient referrals or in connection with the performance of professional services.

100.    New York Education Law § 6530(17) prohibits pharmacies and other health care professionals from "[e]xercising undue influence" over a patient, including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

101.    8 N.Y.C.R.R. §29.1(b)(2) further provides that it constitutes professional misconduct when a pharmacies or other health care professionals "exercise[] undue influence" over a patient or client including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

102.    8 N.Y.C.R.R. § 63.6(b)(7) requires that pharmacists "conduct a prospective drug review before each prescription is dispensed or delivered to a patient or person authorized to act on behalf of the patient. Such review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

103.    New York Education Law § 6808(2)(c), requires that the "names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

104. New York Education Law § 6808(e), requires that every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

105. New York Education Law § 6808(e) provides that pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

106. New York Education Law § 6808(e) provides that pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

107. New York Education Law § 6808(h) requires that individual applicants and all officers, directors, and shareholders with at least ten percent interest in corporate applicants "shall be over good moral character."

## MECHANICS OF THE SCHEME TO DEFRAUD

108. Beginning in 2022 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Topical Pain Pharmaceuticals and other select oral medications, such as NSAIDs and muscle relaxers to Covered Persons.

109. Defendant Farber, through Right Choice, devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiff, in particular, by making material misrepresentations in bill submissions to Plaintiff and fraudulently billing for Topical Pain Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, which were provided, if at all, irrespective of medical necessity, pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, and further, cost the Pharmacy

Defendants a fraction of the amounts that they materially misrepresented in their fraudulent bill submissions to Plaintiff.

110.    Defendants engaged in a massive scheme to defraud in which Farber, through Right Choice, as a matter of pattern, practice and protocol, manufactured, dispensed, or caused to be dispensed, expensive Topical Pain Pharmaceuticals, including diclofenac 3% gel, lidocaine 5% ointment, and Topical Pain Patches, including Lidothol patches, and other specifically targeted, select oral medications, including NSAIDs and muscle relaxers, to Covered Persons pursuant to a pre-determined protocol irrespective of medical necessity.

111.    In 2015, the Department of Health and Human Services, Office of the Inspector General, issued a report noting the potential for fraud in abuse by pharmacies in New York related to the prescription, among other topical pain medications, lidocaine 5% administered through a transdermal pain patch. *See Questionable Billing and Geographic Hotspots Point to Potential Fraud and Abuse in Medicare Part D,* OEI-02-15-00190 (June 2015).

112.    Moreover, in 2018, the U.S. Department of Health and Human Services, Office of the Inspector General, issued a report noting that fraud and abuse by pharmacies was significant in the prescribing and dispensing products containing diclofenac and/or lidocaine. *See, Questionable Billing for Compounded Topical Drugs in Medicare Part D*, OEI-02-16-00440 (August 2018).

113.    Furthermore, Defendant Farber has a history in engaging in No-fault billing fraud schemes involving pharmaceuticals.  Indeed in 2021, Farber and several of his purported partners, Alexander Burlak, Marc Kassman, and Kim Volman were sued for allegedly engaging in a multimillion-dollar fraudulent pharmaceutical billing scheme through their pharmacy, SMK Pharmacy Corp. The scheme involved, among other things, dispensing expensive, medically

unnecessary topical compounded pain creams, and similar to the instant scheme, topical pain gels and ointments, as well as topical pain patches pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements with various prescribing healthcare providers, unlicensed laypersons, and No-fault clinics, with no regard to genuine patient care. *See, e.g., Government Employees Ins. Co. et al. v. SMK Pharmacy Corp d/b/a Nature's First Long Term Care and Compounding., et al.*, 21-cv-03247 (AMD)(RLM) (E.D.N.Y. 2021).

114.    Here, by way of example and not limitation, the Topical Pain Pharmaceuticals account for approximately 98% of the billing to Plaintiff from Right Choice.

115.    Right Choice purports to be a storefront pharmacy operating in Brooklyn, New York, but does not advertise to the general public, and does not otherwise market or seek business from individual patients.

116.    Instead, as part of their pattern, practice and protocol, and in furtherance of their massive scheme to defraud, Defendants entered into illegal, collusive agreements whereby Defendants paid kickbacks to No-fault Clinics and Clinic Controllers in exchange for the No-fault Clinics' and prescribing providers' prescribing large volumes of the Topical Pain Pharmaceuticals, including diclofenac 3% gel and lidocaine 5% ointment, and other select oral medications, including NSAIDs and muscle relaxers, which were specifically targeted for their high profit margins, and directing these prescriptions to be dispensed and billed by Right Choice.

117.    In fact, on information and belief, a vast majority of the billing that Right Choice submitted to Plaintiff for reimbursement of pharmaceuticals dispensed, if at all, to No-fault Claims came from a few prescribing physicians and/or practices, with a history of engaging in No-fault billing scheme.

118.    By way of example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursement from Right Choice to Plaintiff were issued by medical providers that purportedly provided services through Atlantic Medical & Diagnostic PC, a professional corporation in which Jonathan Landow ("Landow") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area. Landow and several of his professional corporations in which he is listed as the record owner, including Atlantic Medical & Diagnostic, P.C., have been sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See, e.g., American Transit Ins. Co., et al, v. Landow, M.D., et al.*, 24-cv-02010 (E.D.N.Y. 2024); *Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y. 2021); *Government Emp. Ins. Co., et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y. 2018); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. County, 2021).

119.    By way of further example but not limitation, numerous other prescriptions routed to Right Choice were issued by Jean-Pierre Georges Barakat, M.D., through his professional corporation, Far Rockaway Medical P.C., in which he is the record owner, which operates at 62-99th Street, Rego Park, New York.  Dr. Barakat, together with multiple pharmacies he has been associated with, have been sued by other No-fault insurance carriers for engaging in pervasive racketeering and pharmaceutical billing fraud schemes involving, among other things, fraudulently generating boilerplate, formulaic, and/or medically unnecessary prescriptions for a variety of pharmaceuticals pursuant to fraudulent billing and treatment protocols and illegal, collusive, and kickback arrangements with the pharmacies.  *See, e.g., Government Employees Ins. Co. et al. v. Direct RX*

*Pharmacy Inc. d/b/a Sharonas Pharmacy, et al.*, 19-cv-05876 (DG)(LB) (E.D.N.Y. 2019); *American Transit Ins. Co. et al. v. New Century Pharmacy, et al.*, 19-cv-05702 (ENV) (E.D.N.Y. 2019).

120.    These Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, were prescribed and dispensed pursuant to a pre-determined protocol that lacked individualized care, was designed to exploit patients for financial gain, was implemented without regard to pharmacologic outcomes, and was implemented with gross indifference to a patient's health and safety.

121.    On information and belief, in connection with the unlawful financial arrangements with No-fault Clinics, the Pharmacy Defendants would pay kickbacks to individuals associated with the No-fault Clinics in order to obtain referrals for the fraudulent Topical Pain Pharmaceuticals and/or other select oral medications to be provided to Covered Persons who treated at the No-fault Clinics. On information and belief, in keeping with the fact that the prescriptions for Topical Pain Pharmaceuticals and/or other select oral medications were the result of unlawful kickbacks and/or referral relationships between the pharmacy and the No-fault Clinics, Farber never met most of the physicians who purportedly signed the prescriptions that were provided to the Pharmacy Defendants.  By way of example and not limitation, during an EUO of Right Choice Pharmacy conducted on July 13, 2022, in connection with the verification of specific claims for reimbursement of Topical Pain Pharmaceuticals and/or other select oral medications as referenced therein, Farber testified that she was unfamiliar with the prescribing providers, that a friend, a former pharmacy owner, suggested she begin billing No-fault insurers, and that the friend provided her with the names of prescribing providers. However, Farber could not provide the friend's full name, had difficulty recalling the name of the pharmacy that the friend previously owned, and could not explain why the friend relinquished ownership of the pharmacy, why the

friend suggested she begin billing No-fault insurers, or why the friend provided her the names of prescribing providers. Nor could Farber fully explain how she established relationships with the prescribing providers. Farber also denied ever speaking to or meeting the prescribing providers.

122.    Moreover, a number of the prescriptions submitted by Farber, through Right Choice, to Plaintiff were fabricated in order to misrepresent that medications were medically necessary, when in fact, the medications were provided, if at all, to financially enrich Farber through a fraudulent protocol of treatment.

123.    Further, the prescriptions from the No-fault Clinics were sent to and obtained by Right Choice directly from the Clinics without any communication or involvement by the Covered Persons. In further keeping with the fact that the prescriptions for the Topical Pain Pharmaceuticals were the result of unlawful financial arrangements between the Pharmacy Defendants and the No-fault Clinics, the Covered Persons were never given access to the prescriptions or given the option to use any other pharmacy other than Right Choice.

124.    At all relevant times mentioned herein, the Topical Pain Pharmaceuticals and/or other select oral medications supplied by Right Choice were provided pursuant to a pre-determined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, who provided the prescriptions to Right Choice to be used in support of the fraudulent Topical Pain Pharmaceuticals claims that exploited and manipulated the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiff and other insurers.

125.    As a result of the unlawful kickback and/or other financial compensation agreements, the Pharmacy Defendants obtained large numbers of prescriptions and access to

Covered Persons' identifying information that enabled them to bill hundreds of thousands of dollars to Plaintiff, for just a few exorbitantly priced Topical Pain Pharmaceuticals and/or other select oral medications.

126.    But for the payment of kickbacks from the Pharmacy Defendants, the No-fault Clinics, would not have had any reason to: (i) direct a substantial number of medically unnecessary prescriptions to Right Choice; (ii) make the Covered Persons' information available to Right Choice; and/or (iii) provide Right Choice with the fraudulent prescriptions.

127.    Upon information and belief, the payment of kickbacks and/or other financial compensation by the Pharmacy Defendants was made at or near the time the prescriptions were issued, but the Pharmacy Defendants and the No-fault Clinics affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

128.    As a result of the unlawful financial arrangements, the Pharmacy Defendants billed hundreds of thousands of dollars to Plaintiff, and likely millions of dollars to other New York automobile insurers, for the Topical Pain Cream and/or other select oral medications.

A.    **Fraudulent Dispensing and Billing of Topical Pain Pharmaceuticals Without Regard to Patient Care in Order to Exploit Patients for Financial Gain**

129.    As part of Defendants' scheme to defraud, Defendants entered into kickback or other financial arrangements with the No-fault Clinics, Clinic Controllers, and/or HCPs, who instead of prescribing cheaper FDA-approved and/or commercially available medication to Covered Persons, would instead prescribe and/or dispense the Topical Pain Pharmaceuticals, including diclofenac 3% gel and lidocaine 5% ointment, and/or Topical Pain Patches, which were prescribed without regard to the efficacy and/or medical necessity of the drugs, and often combined these topical medications with prescriptions for other select oral medications, including NSAIDs and muscle

relaxers, which constituted therapeutic duplication, increasing the risk for adverse events in the Covered Persons without any additional therapeutic benefit.

130.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the No-fault Clinics, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the HCPs, as a result of kickbacks and/or other financial compensation agreements between the No-fault Clinics, Clinic Controllers, and Defendants, would prescribe Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to a standard, pre-determined protocol regardless of whether such pharmaceuticals were medically necessary.

131.    Such Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, were issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident, and without first trying commercially available alternative medications that are FDA-approved and available at a significantly lesser cost.

132.    In fact, pursuant to the standard, pre-determined protocol, the Covered Persons were routinely prescribed the Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, without the prescribing provider first taking a detailed patient history and without determining whether the Covered Person was currently taking any medications or suffering from any comorbidities.

133.    Pursuant to the standard, pre-determined protocol, the Covered Persons were routinely prescribed the Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to boilerplate examination reports and/or regimented initial and follow-up examinations, which, on information and belief, were designed

to justify continued, voluminous and excessive use of prescribed pharmaceuticals. The resulting examination reports rarely gave any indication as to why alternative FDA-approved and/or over-the-counter medications would not sufficiently address the Covered Person's condition.

134.   The same Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, were often dispensed and billed by Right Choice notwithstanding the failure of the prescribing provider to indicate these pharmaceuticals were necessary and/or prescribed in the initial evaluation report. Without limitation, the following are examples of such inconsistencies in the prescriptions billed and the prescribing provider's evaluation reports:

- Covered Person A.P. (Claim No. 1103652-03) was allegedly involved in a motor vehicle accident on September 15, 2021.  Thereafter, A.P. presented at ZWH Medical, PC (not named a defendant in the Complaint), a No-fault Clinic located at 1122 Coney Island Avenue, Brooklyn, New York, where they were purportedly underwent an examination by Zakiya Hossain, MD (not named a defendant in the Complaint) and Vyacheslav Mamanov, NP (not named a defendant in the Complaint) on April 7, 2022. In the examination report by Dr. Hossain and Nurse Practitioner Mamanov there is no mention of any topical pain creams.  Nonetheless, Right Choice billed Plaintiff for allegedly dispensing lidocaine 5% ointment pursuant to a prescription allegedly issued by Nurse Practitioner Mamanov on January April 7, 2022.

- Covered Person T.F. (Claim No. 1120393-02) was allegedly involved in a motor vehicle accident on September 29, 2022.  Thereafter, T.F. presented at PARS Medical, PC (not named a defendant in the Complaint), a No-fault Clinic located at 5223 9th Avenue, Brooklyn, New York, where they were purportedly underwent an initial examination by Isaac Kreizman, MD (not named a defendant in the Complaint) on November 21, 2022, followed by examinations on January 16, 2023, and February 23, 2023. In the various evaluation reports by Dr. Kreizman there is no mention of any topical pain creams.  Nonetheless, Right Choice billed Plaintiff for allegedly dispensing lidocaine 5% ointment pursuant to a prescription allegedly issued by Dr. Kreizman, on January 31, 2023.

135.    Irrespective of the needs of any individual Covered Person, the HCPs and No-fault Clinics prescribed the same Topical Pain Pharmaceuticals , which contained the exact same amount of simple ingredients, including diclofenac 3% gel and lidocaine 5% ointment, and/or other pharmaceuticals to each and every Covered Person.

136.    On information and belief, as part of the kickback or other financial compensation agreement with the No-fault Clinics and Clinic Controllers in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms in favor of Right Choice, which, after execution, the No-fault Clinics would cause to be transmitted to Right Choice.

137.    In many if not all instances, the HCPs and/or No-fault Clinics never provided Covered Persons with the prescriptions for Topical Pain Pharmaceuticals and other oral medications to be filled at a pharmacy chosen by the Covered Persons. Rather, the Covered Persons were given the Topical Pain Pharmaceuticals at the No-fault Clinics without even being given the prescription, or in some instances, being told that such medication was being prescribed, to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate pharmacy.

138.    On information and belief, the prescriptions for Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, were filled by Right Choice as part of illicit and collusive arrangements whereby, in exchange for issuing such prescriptions, the referring No-fault Clinics, Clinic Controllers, and/or prescribing providers received illegal payments from Defendants.

139.    At all times relevant herein, Right Choice, as well as the No-fault Clinics, Clinic Controllers, and prescribing providers, knew that there were effective, commercially available, FDA-approved and cheaper medications which would have been suitable to prescribe to Covered Persons, and that the Topical Pain Pharmaceuticals and/or other select oral medications, including NSAIDs and muscle relaxers, were being prescribed solely to enrich Defendants, the No-fault Clinics and Clinic Controllers.

140.    In doing so, and as a result of Defendants' collusive agreements with No-fault Clinics, Clinic Controllers, and/or HCPs, Defendants promoted the sale of the Topical Pain Pharmaceuticals and other select oral medications over effective, commercially available, FDA-approved, cheaper alternatives, and thereby exercised undue influence over the Covered Persons in order to exploit the Covered Persons for their own financial gain.

141.    Demonstrative that the No-fault Clinics prescribed the Topical Pain Pharmaceuticals in order to exploit the patient for financial gain, irrespective of medical necessity and without regard to genuine patient care, in virtually, if not all instances, the No-fault Clinics routinely:

- Failed to document in the Covered Persons' initial or follow-up evaluation reports why the Topical Pain Pharmaceuticals were medically necessary;

- Failed to document a detailed medical history in Covered Persons' initial or follow-up evaluation reports, thereby failing to fully examine or document potential contraindications or comorbidities;

- Failed to document in Covered Persons' initial or follow-up evaluation reports on why commercially available over-the-counter, FDA-approved medications could not be prescribed instead of the Topical Pain Pharmaceuticals; and

- Failed to document in Covered Persons' follow-up reports if the Topical Pain Pharmaceuticals were used by Covered Persons, and if so, were medically beneficial.

142.    Defendants engaged in the scheme to defraud alleged herein when they knew, or should have known, that substantially cheaper and commercially available FDA-approved medications proven to have therapeutic effects were available.

143.    The Topical Pain Pharmaceuticals, including in the form of diclofenac 3% gel and lidocaine 5% ointment, could have and should have been replaced with cheaper, over-the-counter, and readily available substitutes that have substantially similar, if not identical, indications and effects.

144.    The Topical Pain Pharmaceuticals such as those dispensed by Right Choice should be a final treatment option after oral medications and other commercially available, over-the-counter, FDA-approved topical creams are ineffective or not tolerated by patients.

### *Topical Diclofenac Cream*

145.    In order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-Fault Clinics were routinely prescribed a particular Topical Pain Pharmaceutical, in the form of topical diclofenac sodium 3%, at voluminous rates and directed to have this prescription filled and dispensed by Right Choice, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-Fault Clinics, Clinic Controllers and/or prescribing providers, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

146.    Right Choice rarely billed Plaintiff for any formulation of topical diclofenac other than diclofenac sodium 3%. The fact that diclofenac was routinely dispensed and billed by Right Choice almost exclusively in this specific formulation demonstrates a lack of individualized patient care.

147.    Diclofenac gel or cream is a topical NSAID that is commonly used to treat osteoarthritis and skin irritations such as actinic keratosis ("AK"), a type of warty skin growth.

148.     Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for diclofenac, which it often did not, the reports routinely failed to include any potential reason why diclofenac sodium 3% was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and commercially at a fraction of the cost. Exhibit "4" in the Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Right Choice in which Right Choice billed for diclofenac sodium 3% gel where the initial or follow-up examination report corresponding to the prescription purportedly filled by Right Choice did not include any indication that a lower strength alternative was attempted but failed during a conservative course of treatment and failed to include any other potential reason why diclofenac sodium 3% gel was medically necessary above and beyond a substantially similar lower strength commercially available over-the-counter alternative. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1105335-01, 1106457-02, 1107615-01, 1107878-01, 1109425-02, 1110745-02, 1113827-03, 1115604-02, 1115869-01, 1115895-02, 1116330-02, 1116418-02, 1118995-03, 1120290-03, 1122321-01, 1125458-03, and 1138136-03, in which Right Choice mailed fraudulent claims for diclofenac sodium 3% gel, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

149.     By engaging in a fraudulent scheme whereby diclofenac sodium 3% was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength,

FDA-approved commercially available products, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

150.    Right Choice billed approximately $1,886.00 or $1,888.00 to fill a single prescription for diclofenac sodium 3% gel, 200 grams.

151.    Diclofenac sodium is not without risks or side effects, and the increased dosage at which the Prescribing No-Fault Clinics and prescribing providers prescribed diclofenac increases the risk of the side effects associated with the medication.

152.    The major risks associated with diclofenac sodium 3% include heart and blood vessel issues, including heart disease, heart attack and stroke, as well as severe stomach and bowel issues, including ulcers, intestinal bleeding, or perforation. The associated risks are high in those with pre-existing cardiovascular and gastrointestinal issues. The risks are also greater with higher doses and long-term use.

153.    In fact, the United States Food and Drug Administration ("FDA") requires a "Black Box" warning for topical diclofenac, which the FDA imposes when a drug carries a serious safety risk. For topical diclofenac, the "Black Box" warning lists the risks of serious cardiovascular and gastrointestinal events, which can be fatal.

154.    On information and belief, notwithstanding the risks of serious cardiological and/or gastrointestinal complications associated with diclofenac sodium 3%, the No-Fault Clinics and prescribing providers routinely prescribed it to Covered Persons with a recorded history of heart disease and/or stomach ulcers, without an indication the patient first tried any of the lower-strength and/or FDA-approved, commercially available alternatives.

155.    Furthermore, on information and belief, topical diclofenac is classified as a NSAID and prescribing it concurrently with other oral NSAIDS, such ibuprofen, naproxen, and/or

meloxicam, could result in an increased risk of adverse events, such as hemorrhage, or a higher rate of gastrointestinal toxicity.  FDA product labels for over-the-counter brands of a lower dosage topical diclofenac contain warnings to this effect and generally recommends against concomitant use.

156.    By way of example and not limitation, Defendants' fraudulent scheme set forth herein resulted in therapeutic duplication with diclofenac being prescribed concurrently with oral NSAIDs, in the following occasion: Covered Person M.K. (Claim No. 1137014-01) was allegedly involved in a motor vehicle accident on October 3, 2023.  Thereafter, M.K. presented at Ace EmergentMedical Care, PC (not named a defendant in the Complaint) at 108-25 Merrick Boulevard, Jamaica, New York, where they were purportedly examined by Christian Bannerman, MD (not named a defendant in the Complaint) on October 11, 2023.  Right Choice then billed Plaintiff for allegedly dispensing diclofenac sodium 3% gel simultaneously with celecoxib 200mg tablets, an oral NSAID, pursuant to a prescription allegedly issued by Dr. Bannerman on October 11, 2023.

157.    On information and belief, Defendants' illegal, collusive arrangements with the No-Fault Clinics, Clinic Controller, and/or prescribing providers, which caused diclofenac sodium 3% to be prescribed to Covered Persons at excessive amounts without individualized care, was profit-driven and demonstrated a genuine disregard for the patients' health and safety.

158.    On information and belief, Right Choice was not and is not entitled to any reimbursement from Plaintiff for diclofenac sodium 3% topical pain cream.

159.    The bills mailed by Right Choice were fraudulent in that they misrepresented that (i) the diclofenac sodium 3% gel were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were

prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiff for expensive diclofenac sodium 3% gel that they were not entitled to receive under the No-fault law and implementing regulations.

160.    Defendants' activities described herein with respect to diclofenac sodium 3% topical pain cream promoted and facilitated other acts that imposed foreseeable costs onto Plaintiff, including, but not limited to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

### *Topical Lidocaine Pain Ointment and Patches*

161.    In order to facilitate the fraud set forth herein, Covered Persons at the No-fault Clinics were routinely prescribed additional particular Topical Pain Pharmaceuticals, in the form of topical lidocaine 5% ointment and/or lidocaine 4.5%-5% transdermal patches, at voluminous rates and directed to have this prescription filled and dispensed (if at all) by Right Choice, pursuant to Defendants' illicit, collusive arrangements with the No-Fault Clinics, Clinic Controllers, and/or HCPs, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

162.    Right Choice rarely billed Plaintiff for any formulation of topical lidocaine other than lidocaine 5% ointment or lidocaine 4.5%-5% transdermal patches. The fact that lidocaine was routinely dispensed and billed by Right Choice almost exclusively in this specific formulation demonstrates a lack of individualized patient care.

163.    Lidocaine is a local anesthetic used to relieve neuropathic pain of post-herpetic neuralgia, also referred to as after-shingles pain, and to relieve skin irritations such as minor burns, sunburn, abrasions of the skin, insect bites and hemorrhoids.

164.    According to *New York State Workers' Compensation Board, Non-Acute Pain Medical Treatment Guidelines* (First Edition, September 15, 2014, page 38; August 25, 2021 Update, effective May 2, 2022, page 39), *New York State Workers' Compensation Board, Mid and Low Back Injury* (First Edition, September 15, 2014; August 25, 2021 Update, effective May 2, 2022, page 38) and *New York State Workers' Compensation Board, Neck Injury* (First Edition, September 15, 2014; August 25, 2021 Update, effective May 2, 2022, page 34): "Topical lidocaine is only indicated when there is documentation of a diagnosis of neuropathic pain. In this instance, a trial for a period of no greater than four weeks can be considered, with the need for documentation of functional gains as criteria for additional use."

165.    The prescribing providers routinely failed to document any functional deficit that could be managed by topical lidocaine or a contraindication to use oral medications, demonstrating that the lidocaine 5% ointment (as an ointment or as a 4.5%-5% transdermal patch) was routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

166.    By way of example and not limitation, lidocaine 5% ointment was prescribed to Covered Persons, dispensed by Right Choice and billed to Plaintiff for reimbursement in the following instances where the examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription:

- Covered Person C.J. (Claim No. 1142979-01) was allegedly involved in a motor vehicle accident on January 15, 2024. Thereafter, C.J. presented for treatment at Atlantic Medical & Diagnostic, PC (not named a defendant in the Complaint) at 4009 Church Avenue, Brooklyn, New York, where C.J.

purportedly underwent an examination by Ayssa Swartz, NP (not named a defendant in the Complaint) on February 5, 2024. Even though Nurse Practitioner Swartz's examination report only contained diagnoses of headache, cervical sprain, lumbar strain, thoracic pain, and shoulder and knee derangement, (i.e., no neuropathic pain), lidocaine 5% ointment was prescribed by Nurse Practitioner Swartz on February 5, 2024, and purportedly dispensed by Right Choice on February 19, 2024.

- Covered Person M.G. (Claim No. 1120737-01) was allegedly involved in a motor vehicle accident on September 20, 2022. Thereafter, M.G. presented for treatment at ZWH Medical, PC (not named a defendant in the Complaint) at 1122 Coney Island Avenue, Brooklyn, New York, where M.G. purportedly underwent an examination by Shai Bikel, PA (not named a defendant in the Complaint) on September 22, 2022. Even though Shai Bikel's, PA's examination report only contained diagnoses of cervicalgia, shoulder joint derangement and pain, lumbar ligament sprain and low back pain (i.e., no neuropathic pain), lidocaine 5% ointment was prescribed by Physician Assistant Bikel on September 22, 2022, and purportedly dispensed by Right Choice on October 2, 2022.

- Covered Person A.P. (Claim No. 1103652-03) was allegedly involved in a motor vehicle accident on September 15, 2021. Thereafter, A.P. presented at ZWH Medical, PC (not named a defendant in the Complaint), a No-fault Clinic located at 1122 Coney Island Avenue, Brooklyn, New York, where they were purportedly underwent an examination by Zakiya Hossain, MD (not named a defendant in the Complaint) and Vyacheslav Mamanov, NP (not named a defendant in the Complaint) on April 7, 2022. Even though the examination report by Dr. Hossain and Nurse Practitioner Mamanov only contained diagnoses of cervicalgia, shoulder pain and joint derangement, knee pain and internal derangement, and back pain (i.e., no neuropathic pain), lidocaine 5% ointment was prescribed by Nurse Practitioner Mamanov on January April 7, 2022, and purportedly dispensed by Right Choice on April 14, 2022.

167.   Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for lidocaine 5% ointment, which it often did not, the reports routinely failed to include any potential reason why prescription lidocaine 5% ointment was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-

approved and commercially available at a fraction of the cost, such as Aspercreme, Icy Hot, and Bengay.

168.    Right Choice routinely billed between $609.60, and $1,525.00 to fill a single prescription for lidocaine 5% ointment. However, over-the-counter alternatives, such as Aspercreme and Icy Hot, are commercially available at a retail cost of less than $20 and contain lidocaine 4%.

169.    Despite this disparity in cost for a substantially similar product, on information and belief, Right Choice regularly dispensed and billed for lidocaine 5% ointment without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

170.    By way of example and not limitation, Right Choice dispensed lidocaine 5% ointment for Covered Persons and submitted bills to Plaintiff for reimbursement even though the evaluation reports and/or other documentation in support of this billing demonstrated no medical necessity for lidocaine 5% ointment instead of lidocaine 4% ointment or cream or any indication that the significantly cheaper, commercial-available alternative was considered:

- Covered Person S.M. (Claim No. 1145607-01) was allegedly involved in a motor vehicle accident on March 12, 2024.  Thereafter, S.M. presented for treatment at PARS Medical, PC (not named a defendant in the Complaint) at 5223 9th Avenue, Brooklyn, New York, where they were purportedly examined by Isaac Kreizman, MD (not named a defendant in the Complaint) on March 21, 2024, followed by an examination on May 2, 2024. Even though Dr. Kreizman's examination reports make no mention of S.M. having first tried any lower dosage of lidocaine ointment, lidocaine 5% ointment was prescribed by Dr. Kreizman on March 21, 2024, and May 3, 2024, and purportedly dispensed by Right Choice on March 22, 2024, May 11, 2024, respectively.

- Covered Person S.T. (Claim No. 1138071-03) was allegedly involved in a motor vehicle accident on November 2, 2023.  Thereafter, S.T. presented for treatment at PARS Medical, PC (not named a defendant in the

Complaint) at 5223 9th Avenue, Brooklyn, New York, where they were purportedly examined by Isaac Kreizman, MD (not named a defendant in the Complaint) and Gregory Abramov, FNP (not named a defendant in the Complaint), on February 5, 2024. Even though the examination report makes no mention of S.T. having first tried any lower dosage of Lidocaine ointment, lidocaine 5% ointment was prescribed by Dr. Kreizman on February 5, 2024, and purportedly dispensed by Right Choice on February 9, 2024, and then prescribed by Gregory Abramov, FNP on March 26, 2024, and purportedly dispensed by Right Choice on March 28, 2024.

- Covered Person L.K. (Claim No. 1151006-01) was allegedly involved in a motor vehicle accident on May 17, 2024.  Thereafter, L.K. presented for treatment at Atlantic Medical & Diagnostic, PC (not named a defendant in the Complaint) at 5506 Avenue N, Brooklyn, New York, where they were purportedly examined by Mario Leon, PA (not named a defendant in the Complaint) on July 30, 2024, followed by examinations on August 27, 2024, October 22, 2024, and November 12, 2024. Even though Mario Leon, PA's examination reports make no mention of L.K. having first tried any lower dosage of lidocaine ointment, lidocaine 5% ointment was prescribed by Physician Assistant Leon on July 30, 2024, August 27, 2024, October 1, 2024, and November 12, 2024, and purportedly dispensed by Right Choice on August 21, 2024, September 7, 2024, October 16, 2024, and November 16, 2024, respectively.

171.    Additionally, on information and belief, Right Choice also routinely dispensed and billed Plaintiff for reimbursement of lidocaine 5% ointment despite the fact that it was prescribed concurrently with oral medications, such as NSAIDs and muscle relaxers, and/or concurrently with another Topical Pain Cream, such as diclofenac 3% gel, in order to maximize profits without regard for patient care. By way of example and not limitation, Right Choice submitted supporting documentation to Plaintiff for reimbursement of lidocaine 5% ointment concurrently with other medications in the following instances:

- Covered Person R.L. (Claim No. 1130952-01) was allegedly involved in a motor vehicle accident on May 18, 2023. Thereafter, R.L. presented at Home Visits PA, PC (not named a defendant in the Complaint) at 5506 Avenue N, Brooklyn, New York, where he was purportedly examined by Nick Nicoloff, NP (not named a defendant in the Complaint) on May 18, 2023.  Defendant Right Choice then billed Plaintiff for allegedly dispensing

lidocaine 5% ointment simultaneously with Naproxen 500mg tablets, an oral NSAID, on June 13, 2023, July 10, 2023, August 3, 2023, and September 7, 2023, pursuant to prescriptions allegedly issued by Nick Nicoloff, NP, on May 30, 2023, June 21, 2023, July 19, 2023, and August 16, 2023, respectively.

- Covered Person G.S. (Claim No. 1126365-01) was allegedly involved in a motor vehicle accident on February 17, 2023. Thereafter, G.S. presented at PARS Medical, PC (not named a defendant in the Complaint) at 5223 9th Avenue, Brooklyn, New York, where they were purportedly examined by Isaac Kreizman, MD (not named a defendant in the Complaint) on February 27, 2023. Right Choice then billed Plaintiff for allegedly dispensing lidocaine 5% ointment simultaneously with Ibuprofen 400mg, a NSAID, pursuant to prescriptions allegedly issued by Dr. Kreizman on February 27, 2023, March 13, 2023, and April 24, 2023. Thereafter, Right Choice then billed Plaintiff for allegedly dispensing lidocaine 5% ointment simultaneously with ibuprofen 600mg, a NSAID, and tizanidine 4mg tablets, a muscle relaxant, pursuant to prescriptions allegedly issued by Dr. Kriezman on May 9, 2023, June 29, 2023, and August 28, 2023.

- Covered Person Z.L. (Claim No. 1141933-01) was allegedly involved in a motor vehicle accident on January 18, 2024. Thereafter, Z.L. presented for treatment at Atlantic Medical & Diagnostic, PC (not named a defendant in the Complaint) at 5506 Avenue N, Brooklyn, New York, where they were purportedly examined by Mario Leon, NP (not named a defendant in the Complaint) on January 23, 2024. Right Choice then billed Plaintiff for allegedly dispensing lidocaine 5% ointment simultaneously with diclofenac 3% gel, and Cyclobenzaprine 7.5mg tablets, a muscle relaxant, pursuant to a prescription allegedly issued by Mario Leon, PA March 27, 2024, May 7, 2024, and June 11, 2024. Thereafter, Right Choice then billed Plaintiff for allegedly dispensing lidocaine 5% ointment, simultaneously with diclofenac 3% gel, pursuant to a prescription allegedly issued by Mario Leon, NP on September 25, 2024.

- Covered Person C.J. (Claim No. 1142979-01) was allegedly involved in a motor vehicle accident on January 15, 2024. Thereafter, C.J. presented for treatment at Atlantic Medical & Diagnostic, PC (not named a defendant in the Complaint) at 5506 Avenue N, Brooklyn, New York, where they were purportedly examined by Mario Leon, NP (not named a defendant in the Complaint) on March 26, 2024, and May 7, 2024. Right Choice then billed Plaintiff for allegedly dispensing lidocaine 5% ointment simultaneously with diclofenac 3% gel, and Cyclobenzaprine 7.5mg tablets, a muscle

relaxant, pursuant to prescriptions allegedly issued by Physician's Assistant Leon on March 30, 2024, May 9, 2024, and June 10, 2024.

172.    Exhibit "5" in the accompanying Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Right Choice in which Right Choice billed for simultaneously dispensing lidocaine 5% ointment and an oral NSAID with or without an oral muscle relaxant.

173.    Moreover, lidocaine 5% ointment is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the lidocaine increases the risk of the side effects associated with the medication.

174.    Excessive dosage or short intervals between doses of lidocaine 5% ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.

175.    Patients should be instructed to strictly adhere to the recommended dosage and a single application of lidocaine 5% ointment should not exceed 5 grams, and no more than 20 grams of ointment should be used in a single day. However, any maximum dosage was virtually never included on the prescriptions purportedly filled by Right Choice, which instead, routinely instructed Covered Persons to apply anywhere from two (2) to four (4) times per day to the affected area, or as needed.

176.    By engaging in a fraudulent scheme whereby lidocaine 5% ointment was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, and without indication on the prescriptions as to safe dosage, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

177.    Right Choice was not and is not entitled to any reimbursement from Plaintiff for the lidocaine 5% ointment or patches.

178.    The bills mailed by Right Choice were fraudulent in that they misrepresented that (i) the lidocaine 5% ointment or patches were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiff for expensive lidocaine 5% ointment that they were not entitled to receive under the No-fault law and implementing regulations.

179.    Defendants' activities described herein with respect to the lidocaine 5% ointment promoted and facilitated other acts that imposed foreseeable costs onto Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

### *Fraudulent Billing for Non-FDA Approved Topical Pain Patches*

180.    In addition to the foregoing billing for Topical Pain Pharmaceuticals, in order to facilitate the fraud set forth herein, Covered Persons at the No-fault Clinics were routinely prescribed Topical Pain Patches, in the form of Lidothol patches, or their equivalent, lidocaine 4.5%-5% transdermal patches ("Lidothol patches"), a non-FDA approved drug, at voluminous rates and directed to have this prescription filled and dispensed by Right Choice, pursuant to Defendants' illicit, collusive arrangements with the No-fault Clinics, Clinic Controllers, and/or

prescribing practitioners, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

181.    The United Stated Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

182.    The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

183.    Federal law requires all new drugs in the United States be shown to be safe and effective for their intended use prior to marketing.  According to the FDA, unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality.  Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, manufactured in a way that endures consistent drug quality, or whether their label is complete and accurate.

184.    The FDA considers Lidothol patches to be an unapproved drug.

185.    Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if health care professionals rely on the drug to treat serious medical conditions where there is no FDA-approved drug to treat the condition. No exception applies to Lidothol patches that may allow them to be marketed as prescription drug products.

186.    Accordingly, on information and belief, no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs, like Lidothol patches, not reviewed by the FDA.

187.    Similarly, on information and belief, no legitimate physician or healthcare provider would issue prescriptions for unapproved drugs like Lidothol patches, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe without any extraordinary risk to the patient.

188.    Notwithstanding the foregoing, Right Choice routinely billed Plaintiff dispensing Lidothol patches despite the availability of FDA-approved alternatives.

189.    In short, the Defendants obtained prescriptions and dispensed and billed for "unapproved" drugs through Right Choice without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete and accurate labelling solely to exploit the patients for financial gain, without regard for genuine patient care.

190.    By engaging in a fraudulent scheme whereby lidocaine 4.5%-5% transdermal patches were routinely prescribed without medical necessity or FDA approval, instead of (and without first prescribing) lower-strength, commercially-available products, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

191.    Moreover, as with the prescription of lidocaine 5% ointment described above, the prescribing providers routinely failed to document any functional deficit that could be managed by topical lidocaine or a contraindication to use oral medications, demonstrating that the Topical Pain Patches were routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

192.    By way of example and not limitation, Topical Pain Patches was prescribed to Covered Persons, dispensed by Right Choice and billed to Plaintiff for reimbursement in the

following instances where the examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription:

- Covered Person M.G. (Claim No. 1120737-01) was allegedly involved in a motor vehicle accident on September 20, 2022. Thereafter, M.G. presented for treatment at ZWH Medical, PC (not named a defendant in the Complaint) at 1122 Coney Island Avenue, Brooklyn, New York, where M.G. purportedly underwent an examination by Shai Bikel, PA (not named a defendant in the Complaint) on September 22, 2022. Even though Shai Bikel's, PA's examination report only contained diagnoses of cervicalgia, shoulder joint derangement and pain, lumbar ligament sprain and low back pain (i.e., no neuropathic pain), a transdermal pain patch containing lidocaine 4.5% was prescribed on November 1, 2022, and purportedly dispensed by Right Choice on November 16, 2022.

- Covered Person G.R. (Claim No. 1114589-01) was allegedly involved in a motor vehicle accident on June 11, 2022. Thereafter, G.R. presented for treatment at Pelham Parkway Medical, PC (not named a defendant in the Complaint) at 717 Southern Boulevard, Bronx, New York, where G.R. purportedly underwent an initial examination by Hong Pak, MD (not named a defendant in the Complaint) on June 16, 2022, followed by examinations on July 14, 2022 and August 22, 2022. Even though Dr. Pak's examination reports only contained diagnoses of lumbar, cervical and thoracic ligament sprain, and shoulder sprain and strain (i.e., no neuropathic pain), a transdermal pain patch containing lidocaine 4.5%-5% was prescribed on August 24, 2022, and purportedly dispensed by Right Choice on November 26, 2022.

- Covered Person V.H. (Claim No. 1117359-01) was allegedly involved in a motor vehicle accident on July, 2022. Thereafter, V.H. presented for treatment at ZWH Medical, PC (not named a defendant in the Complaint) at 1122 Coney Island Avenue, Brooklyn, New York, where V.H. purportedly underwent an examination by Shai Bikel, PA (not named a defendant in the Complaint) on August 9, 2022. Even though Physician Assistant Bikel's examination report only contained diagnoses of cervicalgia, lumbar and thoracic ligament sprain, and elbow, knee and back pain (i.e., no neuropathic pain), a lidocaine 4.5%-5% transdermal patch was prescribed on August 11, 2022, and purportedly dispensed by Right Choice on August 12, 2022.

193. Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for a pain patch containing lidocaine, which it often did not, the reports

routinely failed to include any potential reason why prescription Lidothol (lidocaine 4.5%-menthol 5%) patches were medically necessary above and beyond a substantially similar and/or lower strength alternatives, commercially available at a fraction of the cost, such as generic lidocaine 4%-menthol 1% transdermal patches such as Walgreens' Cool n' Heat Patch or Icy Hot: Max brand patches.

194.    Right Choice routinely billed approximately $2,662.20 to fill a single prescription of sixty (60) Lidothol patches. However, over-the-counter alternatives, such as Walgreens' Cool n' Heat Patch, are commercially available at a retail cost of less than $120 for sixty (60) patches and contain lidocaine 4%-1% transdermal patches.

195.    Despite this disparity in cost for a substantially similar product, on information and belief, Right Choice regularly dispensed and billed for lidocaine 5% patches without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

196.    By way of example and not limitation, Right Choice dispensed lidocaine 4.5%-5% transdermal patches for Covered Persons and submitted bills to Plaintiff for reimbursement even though the evaluation reports and/or other documentation in support of this billing demonstrated no medical necessity for lidocaine 4.5%-5% transdermal patches instead of lidocaine 4%-1% transdermal patches or any indication that the significantly cheaper, commercially available alternative was considered:

- Covered Person M.G. (Claim No. 1120737-01) was allegedly involved in a motor vehicle accident on September 20, 2022. Thereafter, M.G. presented for treatment at ZWH Medical, PC (not named a defendant in the Complaint) a No-fault Clinic located at 1122 Coney Island Avenue, Brooklyn, New York, where M.G. purportedly underwent an examination by Shai Bikel, PA (not named a defendant in the Complaint) on September 22, 2022.  Even though ZWH Medical PC's report made no mention of M.G. having first tried any lower dosage of lidocaine pain patches at 4%, a

transdermal pain patch containing lidocaine 4.5% was prescribed on November 1, 2022, and purportedly dispensed by Right Choice on November 16, 2022.

- Covered Person G.R. (Claim No. 1114589-01) was allegedly involved in a motor vehicle accident on June 11, 2022. Thereafter, G.R. presented for treatment at Pelham Parkway Medical, PC (not named a defendant in the Complaint) a No-fault Clinic located at 717 Southern Boulevard, Bronx, New York, where G.R. purportedly underwent an examination by Hong Pak, MD (not named a defendant in the Complaint) on June 16, 2022, followed by examinations on July 14, 2022 and August 22, 2022. Even though Pelham Parkway Medical PC's reports made no mention of G.R. having first tried any lower dosage of lidocaine pain patches at 4%, a lidocaine 4.5%-5% transdermal patch was prescribed on August 24, 2022, and purportedly dispensed by Right Choice on November 26, 2022.

- Covered Person V.H. (Claim No. 1117359-01) was allegedly involved in a motor vehicle accident on July, 2022. Thereafter, V.H. presented for treatment at ZWH Medical, PC (not named a defendant in the Complaint) at 1122 Coney Island Avenue, Brooklyn, New York, where V.H. purportedly underwent an examination by Shai Bikel, PA (not named a defendant in the Complaint) on August 9, 2022. Even though Physician Assistant Bikel's examination report made no mention of V.H. having first tried any lower dosage of a lidocaine pain patch at 4%, a lidocaine 4.5%-5% transdermal patch was prescribed on August 11, 2022, and purportedly dispensed by Right Choice on August 12, 2022.

197.    Right Choice was not and is not entitled to any reimbursement from Plaintiff for the Lidothol patches and/or generic lidocaine 4.5%-5% transdermal patches.

198.    The bills mailed by Right Choice were fraudulent in that they misrepresented that (i) the Lidothol patches and/or generic lidocaine 4.5%-5% transdermal patches were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments

from Plaintiff for expensive Lidothol patches and/or generic lidocaine 4.5%-5% transdermal patches that they were not entitled to receive under the No-fault law and implementing regulations.

199.    Defendants' activities described herein with respect to the Lidothol patches and/or generic lidocaine 4.5%-5% transdermal patches promoted and facilitated other acts that imposed foreseeable costs onto Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

**B.    Defendants' Topical Pain Pharmaceuticals  Scheme was Designed to Maximize Their Financial Gain**

200.    Defendants targeted lidocaine 4.5%-5% transdermal patches, and ingredients such as diclofenac sodium 3% and lidocaine 5%, to be part of the Topical Pain Pharmaceuticals routinely prescribed pursuant to the fraudulent scheme set forth herein because Right Choice could readily purchase topical pain medications at a low cost, but bill out the medications at egregiously high wholesale prices based on the Pharmacy Fee Schedule.

201.    Pursuant to the Pharmacy Fee Schedule governing topical pain medications, Right Choice was entitled to the average wholesale price (AWP) minus 12% (for brand name drugs) or 20% (for generic drugs) for each ingredient within the medication, together with a nominal dispensing fee.

202.    In connection with Right Choice's request for reimbursement from Plaintiff, Right Choice typically submitted an NF-3 form, which included the purported NDC numbers and corresponding charges for each drug product dispensed.

203.    The NDC numbers listed on the NF-3 forms submitted by Right Choice are what identified the purported AWPs for each of the Topical Pain Pharmaceuticals and other select oral medications that Right Choice purported to dispense.

204.    Defendants also never submitted wholesale purchase invoices to Plaintiff demonstrating how much Right Choice actually paid the suppliers for Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, or whether Right Choice actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

205.    On information and belief, the illegal kickback and referral arrangements Defendants entered into with No-fault Clinics, Clinic Controllers, and prescribing providers targeting these specific Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, was motivated by profit maximization rather than genuine patient care.

206.    Defendants' activities described herein with respect to the Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, which were prescribed pursuant to a fraudulent scheme and pursuant to illegal, collusive kickback arrangements, promoted and facilitated other acts that imposed foreseeable costs onto Plaintiff, including, but not limited to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

## DISCOVERY OF THE FRAUD

207.    To induce Plaintiff to promptly reimburse their claims for the Topical Pain Pharmaceuticals, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Farber, through Right Choice, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Farber, through Right Choice, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Farber, through Right Choice, knowingly misrepresented and concealed that Right Choice's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement.

208.    Plaintiff is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days. The documents submitted to Plaintiff in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiff to justifiably rely on them. As a proximate result, Plaintiff have incurred damages of more than $46,000.00 based upon the fraudulent bill submissions.

209.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiff, Plaintiff did not discover and could not have reasonably discovered the fraud until in or about August 2022.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANTS FARBER, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C § 1962(c))

210.    The allegations of paragraphs 1 through 209 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

211.    At all times relevant herein, Right Choice was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

212.    From in or about 2022, through to the filing of this Complaint, Defendant Farber and one or more of the John Does 1 through 5, and ABC Corporations 1 through 5 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Right Choice enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein and in the representative list of predicate acts, annexed hereto, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

213.    At all relevant times mentioned herein, Defendant Farber participated in the affairs of the Right Choice enterprise through continuing a pattern of racketeering activities that consisted of creating, submitting, and/or causing to be submitted fraudulent bills and supporting documents to Plaintiff that were based, in part, on the dispensing of pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals and/or select other oral medications, such as NSAIDs and muscle relaxers, (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical

56

necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

214.    One or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5 participated in the scheme by ensuring that the No-Fault Clinics provided the Right Choice enterprise with a steady and ample supply of fraudulent prescriptions for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Pharmaceuticals and oral NSAIDS, muscle relaxants and other pain medications, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, as well as bogus documentation, that misrepresented the necessity of the pharmaceutical products to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Farber required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent pharmaceutical claims.

215.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

216.    The racketeering acts set forth herein were carried out on a continued basis for a period of more than three (3) years, were related and similar, and were committed as part of the ongoing scheme of Farber, one or more of the John Does 1 through 5, and one or more of the ABC

Corporations 1 through 5, to fraudulently bill pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals and/or select oral medications, including NSAIDs and muscle relaxers, to defraud insurers and, if not stopped, will continue into the future.

217.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Right Choice enterprise continues to pursue collection on the fraudulent billing to the present day.

218.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Farber with the knowledge and intent of one or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5, caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce them to issue checks to Right Choice based upon materially false and misleading information.

219.    Through the Right Choice enterprise, Farber submitted fraudulent claim forms seeking payment for pharmaceutical products, including but not limited to Topical Pain Pharmaceuticals and other select oral medications, such as NSAIDs and muscle relaxers, that were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.  The bills and supporting documents that were sent by and/or on behalf of Farber and/or others acting under his direction and control, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of

those activities, Farber, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5 engaged in a continuous series of predicate acts of mail fraud.

220.    A sample list of predicate acts is annexed hereto which identifies the nature and date of mailings that were made by or on behalf of Farber in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

221.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

222.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

223.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property, in an amount in excess of $46,000.00, the exact amount to be determined at trial.

224.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Farber, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF

### AGAINST FARBER AND RIGHT CHOICE

### (Common Law Fraud)

225.    The allegations of paragraphs 1 through 209 are hereby repeated and re-alleged as though fully set forth herein.

226.    Defendants Right Choice and Farber intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiff, made numerous false and misleading statements of material fact as to the necessity and price of the pharmaceutical products which they purportedly dispensed,

thereby inducing Plaintiff to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Farber, Right Choice made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff for payment.

227.    Defendants Right Choice and Farber intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the dispensing of pharmaceutical products, including but not limited to the Topical Pain Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, were misrepresented.

228.    Defendants Right Choice and Farber intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff, concealed the fact that the pharmaceutical products which they purportedly dispensed, including but not limited to the Topical Pain Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

229.    Defendants Right Choice and Farber intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff, concealed the fact that the services were provided pursuant to a protocol that was intended to maximize Defendants' profits and reimbursements of payments from Plaintiff, as opposed to medical necessity.

230.    On information and belief, Farber, through Right Choice, intentionally, knowingly, fraudulently, and with the intent to deceive, submitted, or caused to be submitted to Plaintiff, patient medical records, assignments of benefits, prescriptions, reports, treatment verifications, and/or bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements that Right Choice was dispensing Topical Pain Pharmaceuticals and select oral medications, including NSAIDs and muscle relaxers, pursuant to legitimate New York State Prescriptions, when it was not;

- False and misleading statements that Right Choice was billing Plaintiff the maximum permissible charges under the No-fault Law for the Topical Pain Pharmaceuticals and select other oral medications, including NSAIDs and muscle relaxers, allegedly provided to Covered Persons, when it was not;

- False and misleading statements that Right Choice was in conformance with core licensing requirements and entitled to receive No-fault benefits when in fact Defendants participated in collusive relationships with medical providers through which Defendant filled prescriptions pursuant to an illegal kickback and referral scheme for medically unnecessary pharmaceuticals;

- False and misleading statements as to why the Topical Pain Pharmaceuticals and select oral medications, including NSAIDs and muscle relaxers, were medically necessary; and

- False and misleading statements regarding the availability of over-the-counter, FDA-approved medications in lieu of Topical Pain Pharmaceuticals and select oral medications that were purportedly provided by Defendants as part of a pre-determined protocol of treatment.

231.    In numerous instances, the medical records, reports, invoices, prescriptions, and bills submitted, or caused to be submitted, by Defendant Farber, through Right Choice, to Plaintiff in connection with Defendants' requests for reimbursement contained false representations which were intended not only to defraud Plaintiff but constituted a grave and serious danger to the Covered Persons and the consumer public.

232.    The foregoing was intended to deceive and mislead Plaintiff into believing that Farber, through Right Choice, was providing medically necessary Topical Pain Pharmaceuticals and other select oral medications, including NSAIDs and muscle relaxers, when, in fact, they were not.

233.    Defendants Farber and Right Choice knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

234.    Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which it was led to believe as a result of Defendants' acts of fraud and deception.

235.    Had Plaintiff known of the fraudulent content of, and misrepresentations within the documentation and bills submitted to it, Plaintiff would not have paid Right Choice's claims for No-fault insurance benefits submitted in connection therewith or made efforts to verify Defendants' fraudulent claims.

236.    Furthermore, Defendants Farber and Right Choice's far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, have harmed, and will continue to harm, the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

237.    By reason of the foregoing, Plaintiff has sustained compensatory damages and been injured in their business and property in an in excess of $46,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS FARBER AND RIGHT CHOICE FARBER**

**(Unjust Enrichment)**

238.    The allegations of paragraphs 1 through 209 are hereby repeated and re-alleged as though fully set forth herein.

239.    By reason of their wrongdoing, Defendants Farber and Right Choice have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiff that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

240.    Plaintiff is therefore entitled to restitution from Defendants Farber and Right Choice in the amount by which Defendants have been unjustly enriched.

241.    By reason of the foregoing, Plaintiff has sustained compensatory damages and been injured in its business and property in an amount in excess of $46,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANT RIGHT CHOICE**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

242.    The allegations of paragraphs 1 through 209 are hereby repeated and re-alleged as though fully set forth herein.

243.    At all relevant times mentioned herein, each and every bill mailed by Right Choice to Plaintiff sought reimbursement for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Pharmaceuticals and a limited variety of other oral medications.

244.    At all relevant times herein, the Defendants Right Choice and Farber exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize

the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing pursuant to an unlawful kickback/referral arrangement.

245.    At all relevant times mentioned herein, each and every bill mailed by Right Choice to Plaintiff sought reimbursement for Topical Pain Pharmaceuticals and/or select other oral medications, including NSAIDs and muscle relaxers, that were dispensed: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.

246.    Because Right Choice engaged in the conduct alleged herein, Plaintiff seeks a declaration that it is not required to pay any of Right Choice's claims for Topical Pain Pharmaceuticals and/or select oral medications, including NSAIDs and muscle relaxers, which were dispensed pursuant to the scheme to defraud alleged herein.

247.    As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the pharmaceuticals purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that Right Choice is not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiff, therefore, is under no obligation to pay any of Right Choice's No-fault claims.

248.    Right Choice will continue to seek reimbursement from Plaintiff for its false and fraudulent claims absent a declaration by this Court that Plaintiff has no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, and regardless of the purported dates of service.

249.    Plaintiff has no adequate remedy at law.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury.

**WHEREFORE,** Plaintiff demands judgment as follows:

i)    Compensatory damages, in an amount in excess of $46,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)    Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)    Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)    Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)    Declaratory relief on the Fourth Claim for Relief declaring that Plaintiff has no obligation to pay any of Right Choice's unpaid claims for Topical Pain Pharmaceuticals and/or select oral medications, whether pending, previously-denied and/or submitted, regardless of whether such unpaid claims were ever denied, and regardless of the purported dates of service;

vii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
      July 15, 2025

                              **MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP**

                              By:   /s/ Lee Pinzow              .
                                    Robert A. Stern, Esq.
                                    James A. McKenney, Esq.
                                    Karina Trost, Esq.
                                    Lee Pinzow, Esq.

                                    100 Wall Street, Ste 700
                                    New York, New York 10005
                                    (212) 858-7769

                                    *Attorneys for Plaintiff American Transit Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AMERICAN TRANSIT INSURANCE COMPANY,

Plaintiff,

-against-

RIGHT CHOICE PHARMACY INC, FLORINA FARBER, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5,

Defendants.

CIVIL ACTION

25-CV-3925

COMPLAINT

(JURY TRIAL DEMANDED)

# COMPLAINT

**MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS FOR PLAINTIFF
100 WALL STREET, SUITE 700
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 858-7769**